# UNITED STATES DISTRICT COURT
## DISTRICT OF MAINE

| | | |
|---|---|---|
| ROBERT L. COUSINS, et al., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | 1:14-cv-00515-DBH |
| | ) | |
| KEITH HIGGINS, et al., | ) | |
| | ) | |
| Defendants | ) | |

## RECOMMENDED DECISION ON DEFENDANTS'
## MOTION FOR SUMMARY JUDGMENT

In this matter, Plaintiffs allege that Defendants were negligent and violated their
civil rights in connection with a fire that destroyed their home, restaurant and adjacent
property on December 4, 2013. The matter is before the Court on Defendants' Amended
Motion for Summary Judgment. (Defendants' Amended Motion for Summary Judgment,
ECF No. 77.) Through their motion, Defendants assert that Plaintiffs have failed to
demonstrate a factual basis for their claims, and that Plaintiffs' claims are barred by state
and federal immunity doctrines.

Defendants consist of the Town of Tremont, the Tremont Volunteer Fire
Department, Keith Higgins, Heath Higgins, Samuel Chisolm, Colton Sanborn, Tadd Jewett,
Mathew Lindsley, and Matthew Tetreault. The pending claims are set forth in Count II
(equal protection), Count IV (substantive due process), Count VIII (emotional distress),
and Counts XI – XII (negligence).

Following a review of the record and after consideration of the parties' arguments, I recommend the Court grant Defendants' motion.

## SUMMARY JUDGMENT STANDARD

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "After the moving party has presented evidence in support of its motion for summary judgment, 'the burden shifts to the nonmoving party, with respect to each issue on which he has the burden of proof, to demonstrate that a trier of fact reasonably could find in his favor.'" *Woodward v. Emulex Corp.*, 714 F.3d 632, 637 (1st Cir. 2013) (quoting *Hodgens v. Gen. Dynamics Corp.*, 144 F.3d 151, 158 (1st Cir.1998)).

A court reviews the factual record in the light most favorable to the non-moving party, resolving evidentiary conflicts and drawing reasonable inferences in the non-movant's favor. *Hannon v. Beard*, 645 F.3d 45, 47-48 (1st Cir. 2011). If a court's review of the record reveals evidence sufficient to support findings in favor of the non-moving party on one or more of his claims, a trial-worthy controversy exists and summary judgment must be denied as to any supported claim. *Id.* Unsupported claims are properly dismissed. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-24 (1986) ("One of the principal purposes of the summary judgment rule is to isolate and dispose of factually unsupported claims or defenses.").

## THE SUMMARY JUDGMENT RECORD

When presented with a summary judgment motion, a court ordinarily considers only the facts included in the parties' statements of material facts, which statements must be

supported by citations to evidence of record. Federal Rule of Civil Procedure 56(c) and District of Maine Local Rule 56(b) – (d) require the specific citation to record evidence. In addition, Local Rule 56 establishes the manner by which parties must present their factual statements and the evidence on which the statements depend. A party's pro se status does not relieve the party of the obligation to comply with the court's procedural rules. *Ruiz Rivera v. Riley*, 209 F.3d 24, 27 – 28 & n. 2 (1st Cir. 2000); *Marcello v. Maine*, 489 F. Supp. 2d 70, 77 (D. Me. 2007).

By rule, a party seeking summary judgment must file, in addition to its summary judgment motion, a supporting statement of material facts setting forth each fact in a separately numbered paragraph, with each factual statement followed by a citation to evidence of record that supports the factual statement. D. Me. Loc. R. 56(b). A party opposing a motion for summary judgment must file an opposing statement in which it admits, denies, or qualifies the moving party's statements by reference to each numbered paragraph, with citations to supporting evidence, and in which it may set forth additional facts, in separately numbered paragraphs, with citation to supporting evidence. D. Me. Loc. R. 56(c). If an additional statement is introduced by the non-moving party, then the moving party must file a reply statement in which it admits, denies, or qualifies the non-moving party's additional statements by reference to each numbered paragraph, with citations to supporting evidence. D. Me. Loc. R. 56(d).

"Facts contained in a supporting or opposing statement of material facts, if supported by record citations as required by this rule, shall be deemed admitted unless properly controverted." D. Me. Loc. R. 56(f). Additionally, "[t]he court may disregard

any statement of fact not supported by a specific citation to record material properly considered on summary judgment." *Id*. Finally, "[t]he court shall have no independent duty to search or consider any part of the record not specifically referenced in the parties' separate statement of facts." *Id.*

Defendants filed a statement of material facts in support of their motion. (ECF No. 76.) In support of each individual statement, Defendants cited record evidence, and attached to their statement the cited evidence. Defendants, therefore, have satisfied the requirements of Local Rule 56. Plaintiffs have not complied with the Rule. Specifically, Plaintiffs have not filed a direct response to Defendants' statement of material facts. Under the Local Rule, Defendants' statements are "deemed admitted" because Plaintiffs failed to dispute Defendants' statements – by denying or qualifying the statements, and by citing record evidence to support their denials and qualifications. D. Me. Loc. R. 56(f). Additionally, while Plaintiffs have provided a competing factual narrative (i.e., the portion of their opposition labeled "facts" in which they set forth 70 statements), none of the individual statements in the narrative is followed by a citation to record evidence. By Rule, "[t]he court may disregard any statement of fact not supported by a specific citation to record material properly considered on summary judgment." *Id*.

In their summary judgment submission, Plaintiffs include factual statements that could conceivably be material to the summary judgment assessment. Plaintiffs, however, do not cite to supporting record evidence. Without citation to the record, Plaintiffs' assertions do not constitute record evidence for purposes of summary judgment. "[T]he Court is required to maintain a strict neutrality between opposing parties and even though

a more forgiving reading may be appropriate for a pro se party in the summary judgment context, it is also true that '[j]udges and magistrate judges who review these filings must be able to rely on procedural rules so as to avoid becoming the lawyer for the unrepresented [party] or devoting an excessive portion of their time to such cases.'" *United States v. Baxter*, 841 F. Supp. 2d 378, 383 (D. Me. 2012) (quoting *Clarke v. Blais*, 473 F. Supp. 2d 124, 129 (D. Me. 2007)).

Nevertheless, the factual assertions contained in the verified complaint and affidavits filed in connection with the summary judgment motion can be considered. That is, where a pro se litigant has failed to comply strictly with the summary judgment rules, this Court has considered the sworn assertions of record. *See Clarke v. Blais*, 473 F. Supp. 2d 124, 128 – 30 (D. Me. 2007) ("The First Circuit has not addressed this notice debate directly, but has said, in the summary judgment context, that unrepresented plaintiffs' opposing affidavits and opposition papers are to be read 'liberally.'" (citing *Posadas de Puerto Rico*, *Inc. v. Radin*, 856 F.2d 399, 401 (1st Cir. 1988), and *Mas Marques v. Digital Equip. Corp.*, 637 F.2d 24, 27 (1st Cir. 1980)); *Demmons v. Tritch*, 484 F. Supp. 2d 177, 182 – 83 (D. Me. 2007). In this case, in addition to the summary judgment record, I have considered Plaintiffs' verified complaint and the affidavits filed by Plaintiffs in this action to the extent the allegations in the complaint and the assertions in the affidavits include facts that would be admissible in evidence and otherwise comply with the requirements of Federal Rule of Civil Procedure 56(c)(4).[1]

---

[1] Federal Rule of Civil Procedure 56(c)(4) provides: "An affidavit or declaration used to support or oppose a motion must be made on personal knowledge, set out facts that would be admissible in evidence, and

On December 4, 2013, a fire of undetermined origin destroyed Plaintiffs' restaurant and residence in Tremont, Maine. (Defendants' Stmt. of Material Facts (DSMF) ¶ 1, ECF No. 76.) A notable feature of the premises was a 40-foot tower/lighthouse built by Plaintiff Robert Cousins within the existing footprint of the preexisting restaurant/residence. (*Id.* ¶¶ 3, 5, 6.) The fire began on the top floor of the tower. Including the ground floor, the tower was a five story structure.

According to the report of the State Fire Marshal's Office, Plaintiff Judy Cousins reported that the fire started at approximately 7:15 p.m. (*Id.* ¶ 8.) Robert Cousins told investigators that he attempted to put out the fire with a fire extinguisher, and told Judy Cousins to dial 9-1-1. (*Id.* ¶¶ 9, 10.)

The record reflects that a woman named Paula Farrell called 9-1-1 at 7:44 p.m., and reported that the top of the lighthouse tower was "all in flames—it's all on fire—it's all engulfed." (Declaration of Nicholas Hardwick, Southwest Harbor Police Department, ECF No. 76-10/82-3; Ex. 4 to Hardwick Declaration (removable media file).) Upon receipt of Ms. Farrell's report, an officer sent an emergency tone to the Tremont Volunteer Fire Department at 7:45 p.m., reporting that the tower was on fire. (DSMF ¶ 12.)

---

show that the affiant or declarant is competent to testify on the matters stated." Because Plaintiffs dated and signed their original complaint under penalty of perjury, the complaint can be considered a declaration by Plaintiffs concerning facts known to them. However, often, a verified complaint includes some assertions that cannot be considered as admissible evidence. For example, a person who executes an affidavit or verified complaint cannot convert hearsay statements into admissible evidence. To constitute admissible evidence, the testimony of a fact witness must be based on personal knowledge acquired through observation. Fed. R. Evid. 602. Additionally, in order to introduce statements attributed to an opposing party, Plaintiffs would have to satisfy the foundational requirements of Federal Rule of Evidence 801.

Fire Chief Keith Higgins of the Tremont Volunteer Fire Department, a defendant in this action, then directed volunteer firefighters to the fire scene, and told the dispatcher to call both the Southwest Harbor and Mount Desert Fire Departments for assistance at the fire scene. (*Id.* ¶ 13.) Chief Higgins and several volunteer firefighters from the Tremont Volunteer Fire Department arrived at the fire scene at approximately 7:49 p.m. (*Id.* ¶ 14.)[2]

According to Plaintiffs, Defendant Heath Higgins was the first firefighter to arrive at the premises, and he instructed Robert Cousins to leave, stating that he was now responsible ("I got it now."). (Verified Compl. at 3, ECF No. 1.) Robert Cousins asserts that at the time, he had almost succeeded in suppressing the fire with a single fire extinguisher and could have completed the job with one more extinguisher. (*Id.*)

Around 7:58 p.m., Fire Chief Samuel Chisolm of the Southwest Harbor Volunteer Fire Department, also a defendant, arrived at the fire scene with several volunteer firefighters. (DSMF ¶ 15.) Several volunteer firefighters from the Mount Desert Volunteer Fire Department arrived at the scene at approximately 8:20 p.m. (*Id.* ¶ 16.)

At or around 8:00 p.m., Southwest Harbor Volunteer Fire Department Deputy Chief Jack Martel arrived and his helmet camera was recording. Deputy Chief Martel asserts the footage depicts the tower fully engulfed with flames of more than 15-feet in height rising

_____

[2] Although Judy Cousins was the first person to discover the fire, Plaintiffs have provided no reliable evidence of the time the fire started. At most, they dispute (without citing evidence) the assertion in the Fire Marshal's report that Judy Cousins reported the start of the fire as 7:15 p.m. Although Plaintiffs assert that Robert Cousins told Judy Cousins to call 9-1-1 when the fire allegedly was small enough that Robert Cousins might have extinguished it with a hand extinguisher, there is no evidence of record that Judy Cousins made the call or otherwise alerted any member of the Tremont volunteer fire department before dispatch received the 7:44 p.m. call from Ms. Farrell. At his deposition, Robert Cousins testified that he should have taken a second extinguisher up the stairs and that the firefighters arrived four minutes later. (Robert Cousins Deposition at 120, ECF No. 76-1.)

from the top of the tower. (DSMF ¶¶ 38 – 40; Declaration of Jack Martel ¶ 13, ECF No. 82-4 / 76-11; Ex. 1 to Declaration (removable media thumb drive).)

As of 8:05 p.m., the entire tower was consumed in flames, which were visible through the windows in the lower levels of the tower. As described by Southwest Harbor Volunteer Firefighter Mary Ellen Martel, and depicted in photographs she took at the scene, flames were "at and/or exiting the windows at every level of the tower [and] the top of the tower was non-existent," having been consumed by fire. (DSMF ¶¶ 42 – 44; M.E. Martel Declaration ¶ 9, ECF No. 82-7 / 76-19.) By 8:44 p.m., the entire structure was ablaze and there effectively was no restaurant or residence to spare from destruction. (DSMF ¶¶ 71 – 74; M.E. Martel Declaration ¶ 5 – 10; DSMF Ex. 17 (removable media thumb drive "Martel Photo 8:44").)

According to Chief Higgins, after assessing the structure, the surrounding exposures/risks, and the location, magnitude, and progression of the fire, he determined that the tower may lack structural integrity, lacked a route of access that did not expose firefighters to potential electrocution, and presented a challenge that exceeded available resources (human, water, and equipment). Chief Higgins, therefore, directed firefighters to perform a defensive attack from the exterior of the structure.[3] (DSMF ¶¶ 22 – 28.) A defensive attack involves the application of as much water as effectively as possible from the exterior of the structure, to control, to the extent possible, the progression of the fire

---

[3] Defendants characterize the fire at Plaintiffs' premises as difficult to access and rapidly expanding, and they note the risk that fire could spread to surrounding buildings, exposures, and neighboring properties. (DSMF ¶¶ 120 – 122.)

and to contain and eventually extinguish the fire. (*Id.* ¶ 29; Audette/Pine Point Fire Training & Consulting Report at 11, ECF No. 76-12.)

The Tremont and Southwest Harbor Volunteer Fire Departments applied thousands of gallons of water (approximately 40,000 gallons) to the structure and surrounding exposures through the use of multiple apparatuses and equipment, including several hand lines, an engine-mounted deck gun, and Southwest Harbor's ladder truck. (DSMF ¶¶ 30, 41, 45, 88.)

Linda Risley, a bystander with no affiliation to Tremont or Southwest Harbor, or their fire departments, took several photographs of the progress of the fire. Ms. Risley's photos appear to be the earliest available photographs of the fire. (DSMF ¶¶ 31 – 32.) Ms. Risley states that she took her first photograph at 7:54 p.m., ten minutes after Ms. Farrell's 9-1-1 call, and five minutes after the arrival of the first Tremont firefighters. (Declaration of Linda Risley ¶ 9, ECF No. 76-13 / 82-6; Ex. A to Risley Declaration (CD-R disc of Risley photos).) The initial photograph, IMG_6864, reflects that a serious fire was underway within five minutes of the arrival of the Tremont firefighters and that water was being applied to the structure.

The record also reflects that water supply issues could have hampered the fire suppression effort. The Town of Tremont does not have pressurized fire hydrants. (DSMF ¶ 46.) The Town of Tremont, as with many rural Maine communities, uses a network of what are called "dry hydrants." (*Id.* ¶ 47.) Dry hydrants are hydrants located adjacent to bodies of water, and firefighters can connect a fire engine or tanker to the hydrant to pump

water into the vehicle's water tank. The engine or tanker then transports the water to the fire scene. (*Id.*)

The Tremont and Southwest Harbor Fire Departments brought approximately 9,000 gallons of water to the fire scene. (*Id.* ¶ 50.) Subsequently, they relied on a "tanker shuttle" consisting of several tanker trucks and fire engines to collect water from the dry hydrants and transport the water to the scene.[4] (*Id.* ¶¶ 51, 52.)

After applying the original 3,600 gallons of water to the fire scene, the Tremont Volunteer Fire Department's tanker truck broke down on route to a nearby pond to get more water. (*Id.* ¶¶ 53, 54.) The tanker operated properly and without issue for more than a year prior to December 4, 2013, and the tanker was serviced, inspected, and certified for proper operation by a third party as recently as May 28, 2013. (*Id.* ¶¶ 55 – 56.) After learning of the breakdown, Chief Higgins called immediately for tankers from the Trenton Volunteer Fire Department and Bar Harbor Fire Department to assist with the tanker shuttle. (*Id.* ¶ 57.) Until the tanker trucks from Trenton and Bar Harbor arrived at the fire scene, Chief Higgins substituted another engine in place of the broken down tanker truck. (*Id.* ¶ 58.)

At approximately 8:15 p.m. the fire was still contained to the tower structure. (*Id.* ¶ 59.) Firefighters continued to apply thousands of gallons of water to the structure as consistently as possible, given the limited water supply. (*Id.* ¶ 61.) Around this time,

---

[4] There are pressurized hydrants approximately two miles from the premises, in Southwest Harbor. While Defendants did not explicitly assert they used the hydrants in their statement of material facts, Chief Higgins did state that the closest pressurized hydrant was utilized. (Compare DSMF ¶ 51 with Declaration of Keith Higgins ¶ 53, ECF No. 76-2.)

something within the structure ignited, which caused the fire to expand rapidly. (*Id.* ¶ 62.) At 8:37 p.m., one of the firefighters reported that something was fueling the fire up the backside of the tower. (*Id.* ¶ 63.)

The Trenton Volunteer Fire Department's tanker truck and the Bar Harbor Fire Department's tanker truck arrived to the fire scene at approximately 8:40 p.m. (*Id.* ¶¶ 64, 65.) The Trenton volunteer firefighters and Bar Harbor firefighters set up portable dump tanks to hold water adjacent to the structure, but before they were able to fill each portable tank, embers from the fire fell onto and burned holes in the vinyl walls of both tanks. (*Id.* ¶¶ 66 – 67.) Without portable tanks into which the tankers could dump their water, hand lines attached to each tanker's pumper applied the tankers' water directly to the structure. (*Id.* ¶ 68.) This approach was necessarily less efficient because when the tankers were emptied, the tankers had to leave the scene to refill the tanks.[5] (*Id.* ¶ 69.)

At 8:41 p.m., Chief Higgins radioed the dispatcher and directed him to call the Regional Communication Center to request any available tankers go to the fire scene. (*Id.* ¶ 70.) By 8:44 p.m., the entire structure was fully involved in flames. (*Id.* ¶¶ 71, 74.) Although at times, the firefighters were able to "darken" the flames, they could never fully control the fire. (*Id.* ¶ 77.)[6]

---

[5] Roger Audette, Defendants' expert witness, has opined that the fire suppression efforts met or exceeded the fire suppression efforts expected of a reasonable volunteer fire department in the same or very similar circumstances and the defensive firefighting tactic employed by Chief Higgins and responding firefighters was appropriate and met the standard of care expected of a reasonable volunteer fire department in responding to the December 4, 2013 fire at Plaintiffs' restaurant and residence. (DSMF ¶¶ 96 – 97; Declaration of Roger Audette ¶¶ 1 – 16, ECF No. 76-24; Expert Report at 11 – 12, 15, 21 – 23, ECF No. 76-12.)

[6] Defendants cite a photograph taken by Mary Ellen Martel at approximately 8:47 p.m. (DSMF ¶ 80; DSMF Ex. 18, ECF No. 76-22; DSMF Ex. 19, Martel Photo 8:47 (removable media thumb drive).)

During the first hour of the response to the fire, Chief Higgins called for the power company to shut off power to the structure. (DSMF ¶ 84; Defendants' Reply Statement at 59.) Because power lines continued to supply electrical power to the structure, there was a risk of electrocution for firefighters who operated beneath live overhead power lines. (DSMF ¶ 82.) For example, live electrical lines, including lines connected to the structure, can burn off, detach, and fall onto firefighters and equipment. (*Id.* ¶ 83.) At approximately 8:51 p.m., the power company shut down the grid on the Tremont/Southwest Harbor side of Mount Desert Island, which shut off power to the structure. (*Id.* ¶ 85.)

Defendants Tadd Jewett, Matthew Lindsley, and Matthew Tetreault are members of the Tremont Volunteer Fire Department, and Colton Sanborn, is a member of the Southwest Harbor Volunteer Fire Department. (DSMF ¶¶ 102, 104.) During his deposition, Mr. Cousins testified that he has no idea what Defendants Jewett, Lindsley, Tetreault, and Sanborn did or did not do related to the fire suppression effort. (*Id.* ¶ 123.) Plaintiffs claim Defendant Sanborn "gave a thumbs up and big smile" to their daughter and, on three occasions in the spring and summer of 2014, "revved up" his engine and yelled "immatur[e] expletives" from his window at members of Plaintiffs' family. (*Id.* ¶ 124.) [7]

Defendant Town of Tremont is a municipality organized under the laws of the State of Maine that serves the Tremont community. (*Id.* ¶ 105.) Defendant Tremont Volunteer Fire Department is an incorporated fire-fighting unit organized under Title 13-B of the Maine Revised Statutes. (*Id.* ¶ 106.) The Southwest Harbor Volunteer Fire Department is

---

[7] Plaintiffs filed this action in December 2014.

an incorporated fire-fighting unit organized under Title 13-B of the Maine Revised Statutes. (*Id.* ¶ 107.)

*The Verified Complaint*

In the verified complaint, Plaintiffs include many accusations regarding Defendants Keith and Heath Higgins and their dislike of Plaintiffs. For example, they state that "[f]irefighters were told not to frequent Cap'n Nemo's establishment [i.e., the restaurant] or they would be reprimanded," and that "Heath Higgins spoke out in public on several occasions that if Cap'n Nemo's ever caught fire they would let it burn. Witnesses will verify this." (Complaint at 4, ¶¶ 1, 3.) Plaintiffs have not provided any witness affidavits to support the assertion, and they have not attested that they heard such a statement or by whom the statement might have been relayed to them.

Plaintiffs also discuss municipal licensing challenges they had to overcome because Defendants Keith and Heath Higgins alleged their restaurant did not meet applicable standards. (*Id.* at 4 − 7, ¶¶ 5 − 9, 11 − 12.) Plaintiffs attached to their unverified amended complaints certain documents, including emails and town meeting minutes from 2010 and 2011. Assuming the documents are admissible (the documents have not been authenticated), the documents demonstrate that Fire Chief Keith Higgins informed Tremont officials that the Fire Marshal's Office was working with Plaintiffs to finalize a few items on a list of fire hazard-related deficiencies. (ECF Nos. 16-3, 16-4, 36-2, 36-3, 36-4.) In a December 14, 2010, letter to the Fire Marshal, Defendant Chief Higgins reported a long list of "concerns our department has about the condition of a mixed use

structure in our community," and stated that he felt it was the Department's duty to "protect the family and patrons from any hazards." (ECF Nos. 16-2, 36-1.)

Plaintiffs also attached to their pleadings an email communication Chief Higgins addressed to one "Millard Billings" on April 27, 2012. In the email, Chief Higgins proposed that the Town install additional dry hydrants at three or four locations. (ECF Nos. 16-3, 36-6.)

Plaintiffs also attached to their pleadings a police report authored by Deputy Sheriff Shane Campbell. According to the report, Deputy Campbell received a complaint from Robert Cousins in June 2014 (six months after the fire) concerning the disappearance of a plywood sign from the site of the former restaurant. In his investigation of the matter, Deputy Campbell spoke with Chief Higgins, and Chief Higgins reportedly stated he was familiar with the sign because it read "Fire Department Special, Blackened Had, Warm Beer," and that members of the department were offended by the sign. Later, Defendant Tetreault admitted to Deputy Campbell that he had removed the sign. (ECF Nos. 16-8, 36-7.) The District Attorney declined prosecution. (ECF Nos. 16-9, 36-8.)

In the verified complaint, Plaintiffs assert that Judy Cousins observed Defendant Heath Higgins operate a hose during the fire, and that he applied the water on the area 25 feet from the flames. When the water ran out, Judy Cousins asked him where the water was and he responded, "In the ocean." (Verified Compl. ¶ 16.) Plaintiffs also assert that

during the fire, Robert Cousins asked Defendant Jewett why no water was being put on the fire, and Defendant Jewett responded that there was a concern for a "flare up." [8] (*Id.* ¶ 17.)

### *Declaration of Plaintiff Judy Cousins*

Judy Cousins filed a sworn declaration as part of Plaintiffs' opposition to the motion for summary judgment. In the declaration, Judy Collins asserts that the 1000 gallons of water transported by one of the ladder trucks that responded to the fire was used for a neighbor's roof and could have extinguished the fire if used on Plaintiffs' property. She also recounted some incidents that reflect some animosity or disagreement between Plaintiffs and certain members of the Tremont Volunteer Fire Department.

### *Third-Party Witness Affidavits*

With their amended pleadings, Plaintiffs included affidavits from third parties Scott Grierson and Sarah Macquin. Mr. Grierson is a former Tremont selectperson. In his April 1, 2015, affidavit Mr. Grierson states in part:

> As Chairman of the Tremont Board of Selectm[e]n, I moderated meetings during which I observed a pattern of antagonism and discord between several members/representatives of the Tremont Volunteer Fire Department and Robert Cousins, representing his family's restaurant Captain Nemos.
>
> Between 2003 and 2009, I was present when comments and discussions pertaining to Robert Cousins and his restaurant Captain Nemos were made both before, during, and after official meetings by certain representatives of the Tremont Volunteer Fire Department that demonstrated a high level of antagonism with and clear dislike for Mr. Cousins and his establishment.

(Affidavit of Scott Grierson, ECF Nos. 16-11, 36-10.)

---

[8] Defendants deny that Defendant Jewett made this statement, but they do not cite a statement from Defendant Jewett denying the statement. (Defendants' Reply Statement at 48.)

In her April 1, 2015, affidavit, Ms. Macquinn, a member of the Southwest Harbor Fire Department and the Tremont Volunteer Fire Department, asserts that she was disturbed by the actions of some Tremont firefighters and the plan of attack during the fire on Plaintiffs' property. She maintains that the defensive plan of attack (i.e., no one to enter the interior of the building) ordered by Chief Higgins was not required as an interior attack would have suppressed the fire. Ms. Macquinn, who resigned from her position a month after the fire, also reported that Captain Heath Higgins did not apply water to the structure, but instead applied water "everywhere but the structure." (Affidavit of Sarah Macquinn, ECF Nos. 16-10, 36-9 ¶ 17.)

## DISCUSSION

Defendants first contend that Plaintiffs have failed to generate any facts from which a reasonable jury could conclude that Defendants were negligent. Defendants maintain that because Plaintiffs cannot prevail on their negligence claim, they cannot prevail on their constitutional claims.

### A. Plaintiffs' State Law Claims

#### 1. Negligence

In counts XI and XII, Plaintiffs allege that Defendants breached the standard of care that governed their firefighting duties. To prevail on a negligence claim, a plaintiff must establish that the defendant owed a duty of care to the plaintiff, that the defendant breached the duty of care, and that the plaintiff suffered an injury/damages as the result of the breach of the duty of care. *Murdock v. Thorne*, 2017 ME 136, ¶ 11, 166 A.3d 119, 122; *Lougee Conservancy v. CitiMortgage, Inc.*, 2012 ME 103, ¶ 29, 48 A.3d 774, 785. "Whether a

plaintiff is owed a duty of care is a matter of law." *Stanton v. Univ. of Maine Sys.*, 2001 ME 96, ¶ 8, 773 A.2d 1045, 1049. Whether a breach occurred and whether the breach caused the harm in question are questions of fact. *Murdock*, 2017 ME 136, ¶ 13; *Reid v. Town of Mount Vernon*, 2007 ME 125, ¶ 14, 932 A.2d 539, 544 (existence of breach is "ordinarily" a question of fact).

In support of their negligence claim, Plaintiffs cite 30-A M.R.S. §§ 3153 and 3154. (Am. Complaint at 38 – 39.) Section 3153 imposes the duty on fire chiefs to "direct all operations to prevent further destruction and damage." *Id.* § 3153(2)(E).[9] Section 3154 provides that "[f]irefighters are under a duty to extinguish all fires to which they are called, to protect lives and property endangered by fires and to carry out all other related activities as directed by the fire chief." *Id.* § 3154(1).

While the statutes might impose upon Defendants certain general duties in their fire suppression efforts, Plaintiffs must present evidence of the standards that governed the efforts under the circumstances in this case, and evidence from which a reasonable jury could conclude Defendants breached the duty and caused harm to Plaintiffs. "When a court imposes a duty in a negligence case, the duty is always the same—to conform to the legal standard of reasonable conduct in the light of the apparent risk." *Searles v. Trs. of St. Joseph's Coll.*, 1997 ME 128, ¶ 5, 695 A.2d 1206, 1209 (quotation marks omitted). "Negligence is the proximate cause of damage if it plays a substantial part in causing the

---

[9] Pursuant to the statutes, fire chiefs will "[p]rovide for the maintenance of all fire equipment owned by the municipality." 30-A M.R.S. § 3153(2)(C). While the evidence of record demonstrates that a TVFD tanker truck broke down on the night of the fire, Plaintiffs have not introduced evidence that would support a finding that Defendant Keith Higgins breached his duty to maintain the tanker truck. The mere fact the truck broke down does not establish a breach of duty on the part of a fire chief.

damage and the damage is a direct result of the negligence or the damage was a reasonably foreseeable result of the negligence." *Wheeler v. White*, 1998 ME 137, ¶ 10, 714 A.2d 125, 128. A showing that there is the "possibility" that a breach was the proximate cause of harm will not suffice, as a causation showing requires more than speculation or conjecture. *Allen v. McCann*, 2015 ME 84, ¶ 9, 120 A.3d. 90, 92. "[E]ven if the probabilities are evenly balanced, a defendant is entitled to a judgment." *Id.*

Defendants contend that expert testimony is required to establish the standard of care that governs the assessment of fire hazards, fire suppression techniques, and causation. "[E]xpert testimony may be necessary 'where the matter in issue is within the knowledge of experts only, and not with the common knowledge of lay[persons].'" *Montany v. University of New England*, 858 F.3d 34, 37 (1st Cir. 2017) (quoting *Cyr v. Giesen*, 108 A.2d 316, 318 (Me. 1954)). That is, when the standard of care against which a defendant's conduct will be measured and/or the harmful results of a breach of the standard are within the understanding of experts only, the testimony of an expert witness generally is required. *Maravell v. R.J. Grondin & Sons*, 2007 ME 1, ¶ 11, 914 A.2d 709, 712 – 13. An expert is not required, however, if the nature of the alleged breach and the harm it causes are sufficiently obvious to lie within the common knowledge. *Id.*

Here, Plaintiffs challenge the techniques Defendants used to suppress the fire. Plaintiffs question the decision to employ a defensive rather than an interior attack and Defendants' decision to apply water to the fire and nearby properties in the manner they did. While it is perhaps conceivable that certain firefighting approaches could be within common knowledge, proper firefighting techniques generally and which technique to apply

in a particular case are matters that typically cannot fairly be considered as within the common knowledge of laypersons. To the contrary, firefighting requires a level of training and expertise that is not known to a layperson. Given the claims in this case (i.e., that Defendants should have used an interior rather than a defensive approach and should not have applied water to nearby structures or areas), expert testimony is necessary for Plaintiffs to establish the standard of care required and whether an alternative approach would have generated a different result. In other words, which approach Defendants should have employed to confront the fire on Plaintiffs' property and whether a different approach would have produced a different result are topics that require expert testimony.

A review of the record reveals that Plaintiffs have not designated an expert witness.[10] The "lack of expert evidence in regard to a different outcome" in the absence of an alleged breach "makes 'the link between [the negligent act] and the alleged damage … overly speculative.'" *Corey v. Norman*, *Hanson & DeTroy*, 742 A.2d 933, 940 (Me. 1999) (quoting *Steeves v. Berstein*, *Shur*, *Sawyer & Nelson*, *P.C.*, 1998 ME 210, ¶ 13, 718 A.2d 186, 190). Because expert testimony is required to establish the standard of care required, whether Defendants satisfied the applicable standard, and, if not, whether Defendants' failure to satisfy the applicable standard caused harm to Plaintiffs, and because Plaintiffs have failed to designate an expert witness to testify to the issues, Plaintiffs cannot prevail

---

[10] Plaintiffs' contention that their reference to Kris Bearscove as an expert witness in their Initial Disclosure (ECF No. 84-8) constitutes a designation of an expert witness is unpersuasive. Plaintiffs did not provide the expert witness information required by Federal Rule of Civil Procedure 26(a)(2). In addition, the declaration of Kris Bearscove (ECF No. 84-9) demonstrates that Kris Bearscove is not prepared to offer an opinion in support of Plaintiffs' claim.

on their negligence claims.  Accordingly, Defendants are entitled to summary judgment on

Counts XI and XII.[11]

### 2. *Emotional distress*

In Count VIII, Plaintiffs assert a claim for the infliction of emotional distress.  A

claim for emotional distress requires proof of either an underlying breach of a duty of care

(negligent infliction claim) or an intentional or reckless act involving extreme and

outrageous conduct (intentional infliction claim).  *Bryan v. Watchtower Bible & Tract

Soc.,* 1999 ME 144, ¶¶ 25, 30 & 31, 738 A.2d 839, 847 & 848.  Because Plaintiffs have

not designated an expert to testify that Defendants' approach to the fire was substandard,

Plaintiffs cannot proceed on their claim for emotional distress. That is, the record will not

support a finding that Defendants breached a duty of care, or engaged in tortious reckless

or intentional conduct, which finding would be necessary to sustain a claim for emotional

distress.[12]

---

[11] Plaintiffs' failure to raise a genuine issue in support of their state law claims obviates the need to address the state law immunity doctrines raised in Defendants' motion.  (Motion at 12 – 13.)

[12] "Under Maine's jurisprudence, a court properly may determine, as a matter of law, whether undisputed (or assumed) facts suffice to state a claim for intentional infliction of emotional distress."  *LaChapelle v. Berkshire Life Ins. Co.*, 142 F.3d 507, 511 (1st Cir. 1998).  To the extent Plaintiffs assert a claim against Defendant Colton Sanborn based on conduct he engaged in after the fire, i.e., expressing "thumbs up and big smile" to their daughter and, on three occasions in the spring and summer of 2014, revving his vehicle engine and yelling "immatur[e] expletives" at members of Plaintiffs' family (DSMF ¶ 124), while such conduct might be offensive, under Maine law, civil liability does not ordinarily arise from expressive conduct of this kind. *Curtis v. Porter*, 784 A.2d 18, 22 (Me. 2001) ("To withstand a defendant's motion for summary judgment on a claim of intentional infliction of emotional distress, a plaintiff must present facts [demonstrating, inter alia, that] the conduct was so extreme and outrageous as to exceed all possible bounds of decency and must be regarded as atrocious, utterly intolerable in a civilized community." (internal quotation marks omitted)); *see, e.g.*, *Berry v. Worldwide Language Resources, Inc.*, 716 F. Supp. 2d 34, 54 (D. Me. 2010) ("Liability … does not extend to mere insults, indignities, threats, annoyances, petty oppressions …." (quoting Restatement (Second) of Torts § 46 cmt. d)); *Botka v. S.C. Noyes & Co.*, 2003 ME 128, ¶¶ 10 & 19, 834 A.2d 947, 951, 953 (affirming entry of summary judgment where plaintiff alleged

### 3. Constitutional Claims under 42 U.S.C. § 1983

Plaintiffs assert claims against Defendants for the alleged deprivation of Plaintiff's rights under the Due Process Clause (Count IV) and the Equal Protection Clause (Count II) of the Fourteenth Amendment.  Defendants argue they are entitled to summary judgment based on the doctrine of qualified immunity, given that Plaintiffs have not raised a genuine issue whether Defendants' fire suppression efforts breached the applicable standard of care. (Motion at 13.)

Pursuant to the federal civil rights statute:

Every person who, under color of any statute, ordinance, regulation, custom, or usage ... subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law ...

42 U.S.C. § 1983.

Section 1983 "'is not itself a source of substantive rights,' but merely provides 'a method for vindicating federal rights elsewhere conferred.'" *Albright v. Oliver*, 510 U.S. 266, 271 (1994) (quoting *Baker v. McCollan*, 443 U.S. 137, 144 n.3 (1979)).  To maintain a claim under section 1983, a plaintiff must establish: "1) that the conduct complained of has been committed under color of state law, and 2) that this conduct worked a denial of rights secured by the Constitution or laws of the United States." *Barreto-Rivera v. Medina-Vargas*, 168 F.3d 42, 45 (1st Cir. 1999).

---

defendant "interrupted, berated, insulted, and harassed" plaintiff, "initiated a physical confrontation," and "acted imperiously").

Defendants do not dispute that they acted under color of state law in their role as volunteer firefighters. Instead, they argue that Plaintiff cannot demonstrate liability under § 1983 where Plaintiffs cannot establish that Defendants breached the applicable standard of care. Defendants also contend they are protected from liability by the doctrine of qualified immunity.

Government officers are entitled to qualified immunity unless they violate a constitutional right that was "clearly established" when they engaged in the conduct at issue. *Hunt v. Massi*, 773 F.3d 361, 367 (1st Cir. 2014). "Qualified immunity shields an officer from suit when she makes a decision that, even if constitutionally deficient, reasonably misapprehends the law governing the circumstances she confronted." *Brosseau v. Haugen*, 543 U.S. 194, 198 (2004) (citing *Saucier v. Katz,* 533 U.S. 194, 206 (2001)). "This strain of immunity aspires to 'balance [the] desire to compensate those whose rights are infringed by state actors with an equally compelling desire to shield public servants from undue interference with the performance of their duties and from threats of liability which, though unfounded, may nevertheless be unbearably disruptive.'" *Cox v. Hainey*, 391 F.3d 25, 29 (1st Cir. 2004) (quoting *Buenrostro v. Collazo*, 973 F.2d 39, 42 (1st Cir. 1992)).

Defendants' assertion of qualified immunity requires the Court to assess: (1) "whether the facts, taken most favorably to the party opposing summary judgment, make out a constitutional violation" and (2) "whether the violated right was clearly established at the time that the offending conduct occurred." *Ford v. Bender*, 768 F.3d 15, 23 (1st Cir. 2014). When a court considers whether the constitutional right was clearly established at

the time, the court must determine (a) "whether the contours of the right, in general, were sufficiently clear," and (b) "whether, under the specific facts of the case, a reasonable defendant would have understood that he was violating the right." *Id.*

### 1. *Substantive due process*

"[T]o establish a substantive due process claim plaintiffs must first establish a deprivation of a 'protected interest' in life, liberty, or property." *Velez-Diaz v. Vega-Irizarry*, 421 F.3d 71, 79 (1st Cir. 2005) (citing *Washington v. Glucksberg*, 521 U.S. 702, 722 (1997), and *Rivera v. Rhode Island*, 402 F.3d 27, 33 – 34 (1st Cir. 2005)). Plaintiffs must also demonstrate that the deprivation of the protected right was caused by government conduct. *Id.*

In this case, Plaintiffs have demonstrated a loss of property, but without expert testimony, they cannot show that Defendants caused the loss of the property. Furthermore, where executive action is at issue (as opposed to legislative action), the threshold liability question is "whether the behavior of the governmental officer is so egregious, so outrageous, that it may fairly be said to shock the contemporary conscience." *Gonzalez-Fuentes v. Molina*, 607 F.3d 864, 880 (1st Cir. 2010) (quoting *County of Sacramento v. Lewis*, 523 U.S. 833, 847 n. 8 (1998)). Significantly, "negligence, without more, is simply insufficient to meet the conscience-shocking standard." *Id.* (quoting *J.R. v. Gloria*, 593 F.3d 73, 80 (1st Cir. 2010)). Because Plaintiffs have not demonstrated a non-speculative evidentiary basis to support a finding of negligence or other tortious conduct, or that Defendants' conduct caused Plaintiffs' loss of property, Plaintiffs have similarly failed to

establish a factual basis for a substantive due process claim. In other words, the facts, when viewed most favorably to Plaintiffs, do not support a substantive due process violation.

Even if the facts could support the finding of a constitutional violation, the record lacks any evidence or citation to any authority to suggest that the "contours of the [alleged] right were sufficiently clear" or that a "reasonable defendant would have understood he was violating that right" under the circumstances of this case. *Ford*, 768 F.3d at 23. In the event the record could be construed to find a constitutional violation, therefore, Defendants are entitled to qualified immunity.

In addition, because Plaintiffs have failed to substantiate the due process claim, the Town of Tremont is also entitled to summary judgment. *City of Los Angeles v. Heller*, 475 U.S. 796, 799 (1986) (per curiam) (holding that, in suits brought under 42 U.S.C. § 1983, an underlying constitutional violation by officers is necessary for a successful municipal liability claim); *Leavitt v. Corr. Med. Servs.*, Inc., 645 F.3d 484, 504 (1st Cir. 2011) ("An underlying constitutional tort is required to proceed under a municipal liability theory. Where, as here, there is no constitutional violation by the employees of the municipality, there can be no liability predicated on municipal policy or custom.").

### 2. *Equal protection*

The evaluation of an equal protection claim begins with consideration of two issues: (1) whether "the person, compared with others similarly situated, was selectively treated"; and, if so, (2) whether "such selective treatment was based on impermissible considerations such as race, religion, intent to inhibit or punish the exercise of constitutional rights, or malicious or bad faith intent to injure a person." *Rubinovitz v. Rogato*, 60 F.3d 906, 910

(1st Cir. 1995) (quoting *Yerardi's Moody St. Rest. & Lounge*, *Inc. v. Bd. of Selectmen*, 878 F.2d 16, 21 (1st Cir. 1989)). As explained above, Plaintiffs have not provided a sufficient evidentiary basis for a jury to conclude that Defendants violated the applicable firefighting standards or that they suffered any loss as the result of Defendants' conduct. Plaintiffs, therefore, cannot establish that they were treated differently than anyone else would have been treated under the circumstances. Plaintiffs' equal protection claim, therefore, fails.

## CONCLUSION

Based on the foregoing analysis, I recommend the Court grant Defendants' Amended Motion for Summary Judgment (ECF No. 77), and enter judgment in favor of Defendants on all remaining claims.

## NOTICE

A party may file objections to those specified portions of a magistrate judge's report or proposed findings or recommended decisions entered pursuant to 28 U.S.C. Section 636(b)(1)(B) for which *de novo* review by the district court is sought, together with a supporting memorandum, within fourteen (14) days of being served with a copy thereof. A responsive memorandum shall be filed within fourteen (14) days after the filing of the objection.

Failure to file a timely objection shall constitute a waiver of the right to *de novo* review by the district court and to appeal the district court's order.

/s/ John C. Nivison
U.S. Magistrate Judge

Dated this 28th day of June, 2018.